IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| NAUTILUS INSURANCE CO., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| ABN-AMRO MORTGAGE GROUP, INC., | § | |
| EMERSON LAND & CO. d/b/a | § | CIVIL ACTION NO. H-05-2750 |
| EMERSON MANUFACTURED HOME, | § | |
| LTD., EMERSON MANUFACTURED | § | |
| HOMES, LTD., EMERSON LAND CO., | § | |
| LTD., THE HOME CENTER, LTD., | § | |
| RAYBON LAND & CO., LTD., | § | |
| KEITH S. RAYBON, RAYBON HOMES, | § | |
| LLC, TRAKE HOMES, LLC, KSR | § | |
| DEVELOPMENT, LLC, and MERCURY | § | |
| MANUFACTURED HOME SALES, LTD., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the court is Nautilus Insurance Company's Motion for Summary Judgment and Brief in Support (Docket Entry No. 17).  For the reasons set forth below, plaintiff's motion will be denied.

## I.  Background

This is an insurance coverage dispute.  Plaintiff, Nautilus Insurance Company ("Nautilus"), brought this action seeking a declaratory judgment that it does not have a duty to defend or indemnify its insureds under the applicable general liability policies.  Nautilus's insureds, defendants Keith S. Raybon and

Emerson Land & Co. d/b/a Emerson Manufactured Home, Ltd., Emerson Manufactured Homes, Ltd., Emerson Land Co., Ltd., The Home Center, Ltd., Raybon Land & Co., Ltd., Raybon Homes, LLC, Trake Homes, LLC, KSR Development, LLC, and Mercury Manufactured Home Sales, Ltd. (collectively, the "Emerson Defendants"), are in the business of selling and installing manufactured homes and arranging financing for such sales.

The Emerson Defendants are defendants in two underlying suits. The first lawsuit was filed by defendant ABN-AMRO Mortgage Group, Inc. ("ABN-AMRO") in federal court.[1]   ABN-AMRO is a nationwide mortgage lender that makes mortgage loans based, in part, upon applications submitted by independent mortgage brokers.[2]   In its Fourth Amended Complaint in the underlying federal suit, ABN-AMRO alleges that the Emerson Defendants caused it injury by negligently selling defective homes at inflated prices to non-creditworthy borrowers.[3]   ABN-AMRO also alleges that the Emerson Defendants are guilty of negligent misrepresentation, fraud, and conspiracy.[4]

---

[1]This action is styled <u>ABN-AMRO Mortgage Group, Inc. v. Emerson Manufactured Homes, et al.</u>, Cause No. 04-cv-1787, and is pending in this court before Judge Ewing Werlein, Jr.

[2]Defendant ABN-AMRO Mortgage Group, Inc.'s Response to Nautilus Insurance Company's Motion for Summary Judgment and Brief in Support, Docket Entry No. 39, ABN-AMRO's Fourth Amended Complaint, Exhibit 2, p. 4.

[3]<u>Id.</u> at 10-14.

[4]<u>Id.</u> at 14-22.

The second underlying lawsuit was filed in state court by 928 individual plaintiffs (the "Home Buyers") who purchased manufactured homes from the Emerson Defendants.[5]   In their Sixteenth Amended Petition, the Home Buyers assert that the Emerson Defendants were negligent in the hiring, supervision, and training of employees and contractors that "mistakenly and unintentionally" resulted in misleading advertising, excess insurance coverage, deficient site preparation, deficient foundation construction, deficient assembly of manufactured homes, and deficient attachment of the homes to their foundations.[6]   The Home Buyers claim that the Emerson Defendants' insurance and advertising practices violate the Texas Deceptive Trade Practices Act.   Alternatively, the Home Buyers allege that the Emerson Defendants engaged in fraudulent real estate transactions by fraudulently inducing the Home Buyers into signing contracts associated with the sale and installment of the homes.[7]

Nautilus argues that summary judgment is appropriate because the complaints in the underlying suits do not allege facts that are

---

[5]This action is styled <u>Emerson Home Buyers Assoc., an informal association, April Underwood, et al. v. Emerson Manufactured Homes, Ltd., et al.</u>, cause number 03-01-00267-cv, in the 410th Judicial District Court of Montgomery County, Texas.

[6]Plaintiff Nautilus Insurance Company's Supplemental Motion for Summary Judgment and Supplemental Reply to the Raybon/Emerson Defendants' Supplemental Response to Plaintiff's Motion for Summary Judgment, Docket Entry No. 43, Exhibit 1, Plaintiffs' Sixteenth Amended Original Petition, pp. 2, 14-21.

[7]<u>Id.</u> at 22-45.

potentially covered by the general liability policies issued to the Emerson Defendants and, therefore, that it does not have a duty to defend or indemnify the Emerson Defendants as a matter of law.

## II.  **Summary Judgment Standard**

Summary judgment is warranted when the evidence reveals that no genuine dispute exists regarding any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2552 (1986).  A material fact is a fact that is identified by applicable substantive law as critical to the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2510 (1986).  To be genuine the dispute regarding a material fact must be supported by evidence such that a reasonable jury could resolve the issue in favor of either party.  Id. at 2511.

The movant must inform the court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues.  Celotex Corp., 106 S. Ct. at 2553.  In response to such a showing, the nonmoving party must go beyond the pleadings and proffer evidence that establishes each of the challenged elements of the case, demonstrating the existence of genuine issues of material fact that must be resolved at trial.  Id.

-4-

### III.  **Legal Standards**

Because this action arises under diversity jurisdiction, Texas law governs substantive matters.  Erie R.R. v. Tompkins, 58  S. Ct. 817 (1938); Guaranty National Ins. Co. v. Azrock Industries, Inc., 211 F.3d 239, 243 (5th Cir. 2000).  In general, the insured bears the initial burden of establishing that there is coverage under an applicable insurance policy, while it is the insurer's burden to prove the applicability of an exclusion permitting it to deny coverage.  Venture Encoding Serv., Inc. v. Atlantic Mutual Ins. Co., 107 S.W.3d 729, 733 (Tex. App.–Fort Worth 2003, pet. denied).

Under Texas law insurance policies are subject to the general rules of interpretation and construction applicable to contracts. Progressive County Mut. Ins. Co. v. Sink, 107 S.W.3d 547, 551 (Tex. 2003).  Terms in the policies are given their plain, ordinary, and generally accepted meaning unless the contract itself shows that particular definitions are used to replace that meaning. W. Reserve Life Ins. v. Meadows, 261 S.W.2d 554, 557 (Tex. 1953); Bituminous Cas. Corp. v. Maxey, 110 S.W.3d 203, 208–09 (Tex. App.–Houston [1st Dist.] 2003, pet. denied).  When a contract as worded can be given "a definite or certain legal meaning," then it is unambiguous as a matter of law and the court enforces it as written.  Nat'l Union Fire Ins. Co. v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex. 1995).  If, however, the policy is susceptible to more than one reasonable interpretation, the court must resolve the

ambiguity in favor of the insured.  <u>Progressive County</u>, 107 S.W.3d at 551 (quoting <u>Grain Dealers Mut. Ins. Co. v. McKee</u>, 943 S.W.2d 455, 458 (Tex. 1997)).  Whether an ambiguity exists in the policy is a question of law for the court to determine.  <u>Kelley-Coppedge, Inc. v. Highlands Ins. Co.</u>, 980 S.W.2d 462, 464 (Tex. 1998).  The court will not find a contract ambiguous, however, merely because the parties advance conflicting interpretations.  <u>Id.</u> at 465.

**A.    Duty to Defend**

In deciding whether an insurer owes a duty to defend, Texas courts apply the "eight-corners" rule.  <u>Nat'l Union Fire Ins. Co. v. Merchants Fast Motor Lines</u>, 939 S.W.2d 139, 141 (Tex. 1997).  Under this rule an insurer's duty to defend its insured arises if the complaint alleges facts that potentially support claims for which there is coverage.  <u>Id.</u>  The court must compare the four corners of the complaint with the four corners of the insurance policy to determine if the underlying allegations possibly fall within the coverage of the policy.  <u>Id.</u>  If the pleadings alone do not allege facts within the scope of coverage, the insurer is not legally required to defend the insured.  <u>Id.</u>; <u>Am. Physicians Ins. Exch. v. Garcia</u>, 876 S.W.2d 842, 848 (Tex. 1994).

When applying the eight-corners rule, the court gives a liberal interpretation to the factual allegations contained in the complaint.  <u>Nat'l Union</u>, 939 S.W.2d at 141.  The allegations are

-6-

considered in light of the insurance policy without regard to their truth or falsity. <u>Argonaut Southwest Ins. Co. v. Maupin</u>, 500 S.W.2d 633, 635 (Tex. 1973); <u>Guideone Elite Ins. Co. v. Fielder Road Baptist Church</u>, 197 S.W.3d 305, 308 (Tex. 2006). All doubts regarding coverage are resolved in favor of the insured. <u>Nat'l Union</u>, 939 S.W.2d at 141 (citing <u>Heyden Newport Chem. Corp. v. S. Gen. Ins. Co.</u>, 387 S.W.2d 22, 26 (Tex. 1965)). However, the court may not read facts into the pleadings, look outside the pleadings, or imagine factual scenarios that might trigger coverage. <u>Id.</u> at 142.

## B.   Duty to Indemnify

Under Texas law the duty to indemnify is separate and distinct from the duty to defend. <u>Trinity Universal Ins. Co. v. Cowan</u>, 945 S.W.2d 819, 821-22 (Tex. 1997). It is triggered only by the actual facts establishing the insured's liability in the underlying litigation. <u>Id.</u> at 821. An insurer may therefore have a duty to defend but no duty to indemnify. <u>Farmers Tex. County Mut. Ins. Co. v. Griffin</u>, 955 S.W.2d 81, 82 (Tex. 1997). Also, "the duty to indemnify is justiciable before the insured's liability is determined in the liability lawsuit when the insurer has no duty to defend *and the same reasons that negate the duty to defend likewise negate any possibility the insurer will ever have a duty to indemnify*." <u>Id.</u> at 84 (emphasis in original).

## IV.   The Policies

The general liability policies at issue set out two relevant types of coverage, Coverage A and Coverage B.   Coverage A states that Nautilus will pay

> those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. . . . This insurance applies to "bodily injury" and "property damage" only if [it] is caused by an "occurrence."[8]

Coverage B states that Nautilus agrees to pay

> those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. . . .[9]

The policies also include a variety of exclusions and definitions. Under the "eight-corners rule" these policies must be compared to the facts alleged in the two underlying lawsuits.

## V.   The ABN-AMRO Lawsuit

### A.   The Complaint

In its Fourth Amended Complaint, ABN-AMRO alleges that it funded 676 loans submitted by Royal Lion, an independent mortgage broker, the majority of which were secured by manufactured homes

---

[8]Nautilus Insurance Company's Motion for Summary Judgment and Brief in Support, Docket Entry No. 17, Exhibit 3, p. NIC 217; Exhibit 4, p. NIC 169; Exhibit 5, p. NIC 280; Exhibit 6, p. NIC 354; Exhibit 7, p. NIC 422.

[9]Id., Exhibit 3, p. NIC 221; Exhibit 4, p. NIC 173; Exhibit 5, p. NIC 284; Exhibit 6, p. NIC 358; Exhibit 7, p. NIC 426.

sold by the Emerson Defendants.[10]   The loan applications were ordered and assembled by the Emerson Defendants, then submitted to Royal Lion, which submitted them to ABN-AMRO.   ABN-AMRO alleges that the Emerson Defendants negligently hired and supervised the mortgage broker and loan officers (Royal Lion), appraisers, insurers, and other employees, which led to erroneous valuations of the properties and the borrowers' assets and income.[11]  For example, ABN-AMRO alleges that the Emerson Defendants sent all insurance work to defendant Keith Raybon's cousin, Becky Blankenship, whose inexperience led to higher insurance levels, which reinforced the erroneous valuations.[12]   Similarly, ABN-AMRO alleges that the appraisers hired by the Emerson Defendants relied on incorrect information (some of which was supplied by employees of the Emerson Defendants) to reach artificially high property values.[13]

ABN-AMRO also alleges that the Emerson Defendants were negligent and violated state law in completing these deals by conducting two transactions:  a "pre-closing," which vested title

---

[10]ABN-AMRO's suit against Royal Lion was settled.  Defendant ABN-AMRO Mortgage Group, Inc.'s Response to Nautilus Insurance Company's Motion for Summary Judgment and Brief in Support, Docket Entry No. 39, ABN-AMRO's Fourth Amended Complaint, Exhibit 2, pp. 2, 6-9.

[11]Id. at 4.

[12]Id. at 6.  ABN-AMRO's suit against Blankenship, was settled.  Id. at 2.

[13]Id. at 7-9.

in the borrower and created a lien in favor of the seller; and a
refinance mortgage closing to pay off the pre-existing debt to the
Emerson Defendants.[14]  This practice, ABN-AMRO alleges, was used to
avoid the more stringent requirements of a purchase mortgage.[15]

Finally, ABN-AMRO alleges that several homes were poorly
constructed, leading to property damage that caused the borrowers
to abandon the homes.  For example, ABN-AMRO alleges that the
Emerson Defendants negligently joined two halves of a double-wide
manufactured home, allowing water to seep in, and that wastewater
and sewage systems were improperly installed by the Emerson
Defendants.[16]  ABN-AMRO also asserts that the Emerson Defendants'
improper land development caused damage to the structures and that
many borrowers have sustained bodily injuries caused by these
defects.[17]  As a result, ABN-AMRO alleges that it has been forced
to foreclose upon many of the homes constructed and sold by the
Emerson Defendants.[18]  ABN-AMRO alleges that its collateral value

---

[14]<u>Id.</u> at 5.  ABN-AMRO argues that this practice violated
Rule § 80.136 of Title 10, Part 1 of the Texas Administrative
Code.  <u>Id.</u> note 2.

[15]Defendant ABN-AMRO Mortgage Group, Inc.'s Response to
Nautilus Insurance Company's Motion for Summary Judgment and
Brief in Support, Docket Entry No. 39, ABN-AMRO's Fourth Amended
Complaint, Exhibit 2, p. 5.

[16]<u>Id.</u> at 9.

[17]<u>Id.</u> at 10.

[18]<u>Id.</u> at 9.

was severely diminished because of the damage to the homes, and it has reaped low returns on the properties it has sold.[19]

In addition to negligent hiring and supervision, ABN-AMRO alleges that the facts pleaded also constitute common law and statutory fraud, conspiracy, fraudulent concealment, and fraudulent transfer, and make the Emerson Defendants subject to exemplary damages.[20]

**B.   Analysis**

1.   <u>Was there an "Occurrence"?</u>

The policies state that Coverage A applies only to "property damage" if such damage is caused by an "occurrence."[21]   Nautilus argues that the ABN-AMRO complaint does not allege facts that constitute an "occurrence" within the meaning of the policies.[22]

The policies define "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."[23]   The word "accident" is not defined.

---

[19]<u>Id.</u> at 10.

[20]<u>Id.</u> at 14–22.

[21]The policy applies to "bodily injury" as well as "property damage," but ABN-AMRO has not alleged that it has suffered bodily injury as a result of the Emerson Defendants' actions.

[22]Nautilus Insurance Company's Motion for Summary Judgment and Brief in Support, Docket Entry No. 17, pp. 18–24.

[23]<u>Id.</u>, Exhibit 3, p. NIC 230; Exhibit 4, p. NIC 182; Exhibit 5, p. NIC 293; Exhibit 6, p. NIC 367; Exhibit 7, p. NIC 435.

-11-

The plain, ordinary meaning of "accident" includes the "negligent acts of the insured causing damage which is undesigned and unexpected." <u>Trinity Univ. Ins. Co. v. Cowan</u>, 945 S.W.2d 819, 828 (Tex. 1997).[24]  Nautilus argues that the factual recitations in ABN-AMRO's complaint constitute only intentional actions, regardless of ABN-AMRO's repeated use of the word "negligence."[25]  Nautilus relies on cases such as <u>Allstate Tex. Lloyd's v. Meyers</u>, 2005 U.S. Dist. LEXIS 1974 at *6 (N.D. Tex. 2005), in which the underlying complaint alleged that the insured, a home seller, knowingly misrepresented the quality of the home, but also included an alternative theory of "negligence" based on those facts.  The court in <u>Allstate</u> held that the facts themselves, rather than the legal theories advanced, are controlling in whether a policy offers coverage.  <u>See also</u> <u>Freedman v. Cigna Ins. Co.</u>, 976 S.W.2d 776, 778 (Tex. App.–Houston [1st Dist.] 1998, no writ) ("The label that plaintiff puts on the cause of action is not controlling; it is the allegation of the facts which give that control.").  But the complaint in the ABN-AMRO lawsuit is distinguishable from these

---

[24]The policies exclude coverage for "'bodily injury' or 'property damage' expected or intended from the standpoint of the insured."  <u>Id.</u>, Exhibit 3, p. NIC 218; Exhibit 4, p. NIC 170; Exhibit 5, p. NIC 281; Exhibit 6, p. NIC 355; Exhibit 7, p. NIC 423.  Nautilus argues, and ABN-AMRO does not refute, that ABN-AMRO's allegations of intentional fraud and illegal pre-closing practices are not covered under the policies.

[25]Nautilus Insurance Company's Motion for Summary Judgment and Brief in Support, Docket Entry No. 17, pp. 21–23.

cases.  In addition to its allegations that the Emerson Defendants acted knowingly and intentionally, ABN-AMRO also asserts that the Emerson Defendants negligently hired and supervised insurers, mortgage brokers, and loan officers, and negligently constructed and attached the homes.  These are not negligence theories super-imposed on allegations of intentional conduct.  Instead, these are factual allegations that support a theory of ordinary negligence.

The court concludes that ABN-AMRO's allegations that the Emerson Defendants were negligent in hiring and supervising insurers, mortgage brokers, and loan officers, and were negligent in constructing and attaching the homes constitute "occurrences" within the definition of the policy.[26]  The court must now determine whether these allegations involve "property damage" within the meaning of the policies and, if so, whether any exclusions apply.

2.  Has ABN-AMRO Alleged "Property Damage"?

Nautilus argues that the Emerson Defendants' negligence in hiring and supervising its loan officers, mortgage brokers, and insurers did not cause "property damage" within the definition of

---

[26]There is currently a split among Texas courts as to whether allegations of negligent work can constitute an "occurrence."  See, e.g., Century Surety Co. v. Hardscape Construction Specialties, Inc., 2006 U.S. Dist. LEXIS 47563, at *11-13 (compiling a list of the conflicting opinions). Recognizing this split of authority, the Fifth Circuit has certified the question to the Texas Supreme Court.  Lamar Homes, Inc. v. Mid Continent Cas. Co., 428 F.3d 193, 200 (2005). However, Nautilus does not argue that allegations of negligent construction cannot constitute an "occurrence" as a matter of law, so the court need not decide this issue here.

the policies.[27]  The policies define property damage as "physical injury to tangible property, including all resulting loss of use of that property," or "loss of use of tangible property that is not physically injured."[28]  Nautilus argues that the actions of the Emerson Defendants only resulted in economic damages (i.e., ABN-AMRO's loss of the benefit of its bargain) and that Texas courts do not consider this to be "property damage" covered by general liability policies.[29]  ABN-AMRO responds that its allegations of negligent construction and attachment of the homes constitute "property damage" covered by the policies and, therefore, all resulting damages are also covered by the policies.[30]

ABN-AMRO's allegations of water damage, improperly installed waste systems, and other types of physical damage to the structures and land fall within the policies' definition of "property damage." See, e.g., Gehan Homes, Ltd. v. Employers Mut. Cas. Co., 146 S.W.3d 833 (Tex. App.–Dallas 2004, pet. filed) (holding that claims of negligent construction resulting in physical defects constitutes "property damage"); Mid-Continent Cas. Co. v. JHP Dev. Inc., 2005

---

[27]Nautilus Insurance Company's Motion for Summary Judgment and Brief in Support, Docket Entry No. 17, pp. 10–17.

[28]Id., Exhibit 3, p. NIC 231; Exhibit 4, p. NIC 183; Exhibit 5, p. NIC 294; Exhibit 6, p. NIC 368; Exhibit 7, p. NIC 436.

[29]Nautilus Insurance Company's Motion for Summary Judgment and Brief in Support, Docket Entry No. 17, p. 10.

[30]Defendant ABN-AMRO Mortgage Group, Inc.'s Response to Nautilus Insurance Company's Motion for Summary Judgment and Brief in Support, Docket Entry No. 39, pp. 17–20.

WL 1123759 (W.D. Tex. 2005) (same).  However, alleged economic damages, such as loss of the benefit of a bargain, do not by themselves constitute "property damage" in Texas.  See, e.g., State Farm Lloyd's et al. v. Kessler, 932 S.W.2d 732, 737 (Tex. App.–Fort Worth 1996, writ denied) (holding that misrepresentations about a home's defects by the seller/insured were not covered "property damage").  The issue is whether the policies extend to economic damages when the insured is also accused of causing property damage.

Nautilus argues that because the over-valuations did not "cause" any property damage, these allegations cannot fall within the scope of the policies and therefore do not trigger a duty to defend.  Nautilus relies heavily on Kessler, 932 S.W.2d at 733, in which the underlying suit alleged that the insured, the seller of a house, misrepresented the quality of the house to its buyers, who later discovered drainage and foundation problems.  The court of appeals held that the buyers had only alleged economic damages because they failed to assert that the insured

> injured the property, destroyed the property, or caused the resulting loss of use.  Instead, the [buyers] allege that the [insured] misrepresented the problems. . . . [The insured's] misrepresenta- tions did not *cause* the drainage and foundation problems; those problems existed before negotiations began.  The [buyers] do allege economic damages; that is, repair costs to restore the property to the condition at which the [insured] represented it and loss of use and enjoyment because of the [insured's] allegedly wrongful conduct." Id. at 737 (emphasis in original).

Instead of arguing that the Emerson Defendants' over-valuations caused any "property damage," ABN-AMRO argues that its economic damages "arise from or relate to [the] 'property damage'" and are therefore covered by the policies.[31]   Nautilus disagrees, arguing that economic damages are not covered, no matter what the cause may be.[32]   The court is not persuaded by Nautilus's argument. The facts in <u>Kessler</u> and other cases cited by Nautilus are distinguishable from the facts alleged by ABN-AMRO.  In <u>Kessler</u> the insured was never accused of causing the property damage, only of misrepresenting its existence.  In fact, the <u>Kessler</u> court pointed out that the result would be different if the buyers had alleged that the insured "injured the property, destroyed the property, or caused the resulting loss of use."  <u>Id.</u>  Here, ABN-AMRO alleges that the Emerson Defendants caused the property damage, which it claims gave rise to economic damages.   Moreover, the Nautilus policies state that Nautilus will "pay those sums that the insured becomes legally obligated to pay as damages *because of* 'bodily injury' or 'property damage' to which this insurance applies."[33]

---

[31]Defendant ABN-AMRO Mortgage Group, Inc.'s Response to Nautilus Insurance Company's Motion for Summary Judgment and Brief in Support, Docket Entry No. 39, p. 19.

[32]Nautilus Insurance Company's Reply to ABN-AMRO and Emerson Defendants' Supplement to Their Response to Motion for Summary Judgment, Docket Entry No. 26, p. 4.

[33]Nautilus Insurance Company's Motion for Summary Judgment and Brief in Support, Docket Entry No. 17, Exhibit 3, p. NIC 217;
(continued...)

The plain meaning of this provision is that all damages caused by "property damage" are covered by the policy, and Nautilus does not argue that any ambiguities exist in the policies.[34]  Cf. Hartford Casualty Co. v. Cruse, 938 F.2d 601 (5th Cir. 1991) (holding that home owners who alleged that the insured caused property damage could recover for the resulting diminution of the house's market value after repairs).

ABN-AMRO alleges that the Emerson Defendants' negligent construction practices damaged ABN-AMRO in two ways.[35]  First, ABN-AMRO alleges that the defects caused many of the homeowners to abandon their homes, leaving ABN-AMRO to foreclose on and resell the properties.[36]  Assuming these facts are true, the costs associated with ABN-AMRO's foreclosures and sales were caused by the property damage and are therefore potentially covered by the policies.  However, abandonment for reasons other than property damage would not be covered by the policies.  ABN-AMRO also alleges

---

[33](...continued)
Exhibit 4, p. NIC 169; Exhibit 5, p. NIC 280; Exhibit 6, p. NIC 354; Exhibit 7, p. NIC 422.  (Emphasis added.)

[34]Additionally, all doubts regarding coverage are to be resolved in favor of the insured.  Nat'l Union, 939 S.W.2d at 141 (citing Heyden Newport Chem. Corp. v. S. Gen. Ins. Co., 387 S.W.2d 22, 26 (Tex. 1965)).

[35]Defendant ABN-AMRO Mortgage Group, Inc.'s Response to Nautilus Insurance Company's Motion for Summary Judgment and Brief in Support, Docket Entry No. 39, Exhibit 2, ABN-AMRO's Fourth Amended Complaint, Exhibit 2, pp. 9-10.

[36]Id.

that its "collateral value was severely diminished due to the property damage."[37]   Again, assuming the facts alleged in the complaint are true, the diminution in the value of the properties (ABN-AMRO's collateral) attributable to the physical defects would be covered by the policies.   Any additional loss of ABN-AMRO's benefit of its bargain that was caused by the erroneous information about the buyers' creditworthiness or other misrepresentations, or by the Emerson Defendants' pre-closing practices, is not related to the property damage and, therefore, not covered by the policies.

>   3.   Do Any Exclusions Apply?

Nautilus argues that all of the damages claimed by ABN-AMRO are excluded under the policies.[38]   First, Nautilus argues that the policies' work/product exclusions eliminate coverage for any damage done to the homes.   These exclusions state that the general liability coverage does not apply to

>   k.   Damage to Your Product:   "Property damage" to "your product" arising out of it or any part of it.[39]
>
>   l.   Damage to Your Work:   "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."   This exclusion does not apply if the damaged work or the work out

---

[37]Id.

[38]Nautilus Insurance Company's Reply to ABN-AMRO and Emerson Defendants' Supplement to Their Response to Motion for Summary Judgment, Docket Entry No. 26, pp. 6-15.

[39]Nautilus Insurance Company's Motion for Summary Judgment and Brief in Support, Docket Entry No. 17, Exhibit 3, p. NIC 221; Exhibit 4, p. NIC 173; Exhibit 5, p. NIC 284; Exhibit 6, p. NIC 358; Exhibit 7, p. NIC 426.

of which the damage arises was performed on your behalf
by a subcontractor.[40]

The policy does not explain and the parties do not address the fact
that the "your work" exclusion contains a subcontractor exception,
while the "your product" exclusion does not.  Instead, in reciting
these provisions, Nautilus includes the subcontractor exception in
the "your product" provision.[41]   However, nothing in ABN-AMRO's
complaint indicates that subcontractors were used in the
construction or installation of the homes, so this provision is not
applicable.[42]

The policies define "your product" and "your work" as follows:

21.   "Your product"

    a.   Means:
         (1) Any goods or products other than real
         property, manufactured, sold, handled, distrib-
         uted or disposed of by you . . .
         (2) Containers (other than vehicles), materials,
         parts or equipment furnished in connection with
         such goods or products.

---

[40]*Id.*

[41]Nautilus Insurance Company's Reply to ABN-AMRO and Emerson
Defendants' Supplement to Their Response to Motion for Summary
Judgment, Docket Entry No. 26, p. 6.

[42]Defendant ABN-AMRO Mortgage Group, Inc.'s Response to
Nautilus Insurance Company's Motion for Summary Judgment and
Brief in Support, Docket Entry No. 39, Exhibit 2, ABN-AMRO's
Fourth Amended Complaint, Exhibit 2, pp. 9-10.  The court cannot
assume that subcontractors were used when the complaint does not
mention such use.  Pine Oak Builders, Inc. v. Great American
Lloyds Ins. Co., 2006 Tex. App. LEXIS 5950 at *14 (Tex.
App.-Houston [14th Dist.] 2006, no pet.) (holding that where a
complaint has neither affirmative nor negative statements
regarding subcontractor use, the court will not read facts into
it or imagine factual scenarios in order to find covered claims).

    b.  Includes:
        (1) Warranties or representations made at any
        time with respect to fitness, quality,
        durability, performance or use of "your
        product"; . . .[43]

22. "Your work"

    a.  Means:
        (1) Work or operations performed by you or on
        your behalf; and
        (2) Materials, parts or equipment furnished in
        connection with such work or operations.

    b.  Includes:
        (1) Warranties or representations made at any
        time with respect to fitness, quality,
        durability, performance or use of "your work";
        . . .[44]

Nautilus argues that because the homes are the Emerson Defendants'

work and products, all damage to the homes is excluded.[45]   ABN-AMRO

did not address this issue in its responses.[46]   The work/product

_____

[43]Nautilus Insurance Company's Motion for Summary Judgment
and Brief in Support, Docket Entry No. 17, Exhibit 3, p. NIC 231;
Exhibit 4, p. NIC 183; Exhibit 5, p. NIC 294; Exhibit 6, p. NIC
368; Exhibit 7, p. NIC 436.

[44]Id., Exhibit 3, p. NIC 232; Exhibit 4, p. NIC 184;
Exhibit 5, p. NIC 295; Exhibit 6, p. NIC 369; Exhibit 7, p. NIC
437.

[45]Nautilus Insurance Company's Reply to ABN-AMRO and Emerson
Defendants' Supplement to Their Response to Motion for Summary
Judgment, Docket Entry No. 26, pp. 6-12.

[46]See Supplement to Defendant ABN-AMRO Mortgage Group,
Inc.'s Response to Nautilus Insurance Company's Motion for
Summary Judgment and Brief in Support, Docket Entry No. 25;
Defendant ABN-AMRO Mortgage Group, Inc.'s Response to Nautilus
Insurance Company's Motion for Summary Judgment and Brief in
Support, Docket Entry No. 39; Defendant ABN-AMRO Mortgage Group,
Inc.'s Second Supplement to Nautilus Insurance Company's Motion
for Summary Judgment, Docket Entry No. 37; Defendant ABN-AMRO
Mortgage Group, Inc.'s Response to Plaintiff Nautilus Insurance
Company's Supplemental Motion for Summary Judgment, Docket Entry
No. 41.

exclusions are commonly referred to as "business risk" exclusions, and provide protection for property damage caused by the completed product, but not for the replacement and repair of that product. The justification for treating these risks differently is that the insured can control the quality of the goods and services he provides.  T.C. Bateson Constr. Co. v. Lumbermens Mut. Cas. Co., 784 S.W.2d 692, 694-95 (Tex. App.–Houston [14th Dist.] 1989, writ denied).

The policies' definition of "your product" encompasses the homes themselves since the Emerson Defendants sold them to the Home Buyers.  Similarly, the Emerson Defendants were hired to attach and install the homes on the various sites and, therefore, such services constitute their "work."  Texas courts have held that the "business risk" exclusions extend to any products handled or work completed by the insured, whether or not such products or work are defective themselves.  T.C. Bateson, 784 S.W.2d at 696.  Therefore, any damage to the homes themselves caused by defective construction or installation is excluded from coverage.

The land upon which the homes are situated is not the Emerson Defendants' "work" or "product."  Although ABN-AMRO does not explicitly assert that the land itself has been injured, it does allege that the "properties" have been damaged.[47]  Whether "properties" includes both the land and the structures is unclear.

---

[47]Defendant ABN-AMRO Mortgage Group, Inc.'s Response to Nautilus Insurance Company's Motion for Summary Judgment, Docket Entry No. 39, ABN-AMRO's Fourth Amended Complaint, Exhibit 2, pp. 9-10.

Resolving this factual ambiguity in favor of the insured, the court
concludes that the ABN-AMRO complaint may allege property damage to
the real property surrounding the structures and, therefore,
asserts a claim that is potentially covered by the Nautilus
policies.   However, such damage may be excluded under another
policy exclusion such as the "pollution"[48] exclusion or the
exclusion for "microorganisms, biological organisms, bioaerosols,
or organic contaminants."[49]   ABN-AMRO's complaint only states that

---

[48]The policies contain the following exclusions for
"Pollution":  "(1) Bodily injury or property damage which would
not have occurred in whole or in part but for the actual, alleged
or threatened discharge, seepage, migration, release or escape of
'pollutants' at any time.  (2) Any loss, cost, or expense arising
out of any request, demand, . . . that any insured test for,
monitor, clean up, remove, contain, treat, detoxify or
neutralize, or in any way respond to, or assess the effects of
'pollutants.'" Nautilus Insurance Company's Motion for Summary
Judgment and Brief in Support, Docket Entry No. 17, Exhibit 3, p.
NIC 237; Exhibit 4, p. NIC 193; Exhibit 5, p. NIC 303; Exhibit 6,
p. NIC 378; Exhibit 7, p. NIC 406.  The policies define
"pollutant" as "any solid, liquid, gaseous or thermal irritant or
contaminant, including soot, fumes, acids, alkalis, chemicals and
waste. . . ."  Id., Exhibit 3, p. NIC 231; Exhibit 4, p. NIC 183;
Exhibit 5, p. NIC 294; Exhibit 6, p. NIC 368; Exhibit 7, p. NIC
436.

[49]The policies state that coverage does not extend to
"(1) Liability, injury or damage of any kind, including but not
limited to 'bodily injury', 'property damage', or 'personal and
advertising injury' arising out of, related to, caused by or in
any way connected with the exposure to, presence of, formation
of, existence of or actual, alleged or threatened discharge,
dispersal, seepage, migration, release or escape of any
microorganisms, biological organisms, bioaerosols or organic
contaminants, including but not limited to mold, mildew, fungus,
spores, yeast or other toxins, mycotoxins, allergens, infectious
agents, wet or dry rot or rust, or any materials containing them
at any time, regardless of the cause of growth, proliferation or
secretion.  (2) Any loss, cost or expense arising out of any
request, demand . . . that any insured test for, monitor, clean
up, remove, contain, treat, detoxify or neutralize, or in any way
(continued...)

the improperly installed wastewater and sewage systems caused "unhealthy conditions."[50]   The court is therefore unable to determine the extent to which these exclusions may apply.

Lastly, Nautilus points out that the policy excludes coverage for "punitive or exemplary" damages and, therefore, ABN-AMRO's request for such damages is not covered.  ABN-AMRO does not contest this assertion.  The policies state that coverage does not extend to:

> Punitive or Exemplary Damages: If a "suit" shall have been brought against you for a claim within the coverage provided under the policy, seeking both compensatory and punitive or exemplary damages, then we will afford a defense for such action.  We shall not have an obligation to pay for any costs, interest or damages attributable to punitive or exemplary damages. . . .[51]

This exclusion limits Nautilus's duty to indemnify the Emerson Defendants, but it does not limit Nautilus's duty to defend.

## C.   Conclusion

The court concludes that ABN-AMRO's complaint alleges facts sufficient to support Nautilus's duty to defend since the

---

[49](...continued)
respond to, or assess the effects of microorganisms, biological organisms, bioaerosols or organic contaminants."  Id., Exhibit 3, p. NIC 210; Exhibit 4, p. NIC 196; Exhibit 5, p. NIC 306; Exhibit 6, p. NIC 381; Exhibit 7, p. NIC 409.

[50]Defendant ABN-AMRO Mortgage Group, Inc.'s Response to Nautilus Insurance Company's Motion for Summary Judgment, Docket Entry No. 39, ABN-AMRO's Fourth Amended Complaint, Exhibit 2, p. 9.

[51]Id., Exhibit 3, p. NIC 238; Exhibit 4, p. NIC 194; Exhibit 5, p. NIC 304; Exhibit 6, p. NIC 379; Exhibit 7, p. NIC 407.

diminution in the value of the homes (above the cost of repairs) attributable to physical defects, and damage to the real property surrounding the homes, are potentially covered by Nautilus's policies.   Nautilus's Motion for Summary Judgment (Docket Entry No. 17) on its duty to defend the Emerson Defendants in the underlying ABN-AMRO lawsuit will therefore be denied.   Because Nautilus owes the Emerson Defendants a defense, the court will also deny Nautilus's Motion for Summary Judgment (Docket Entry No. 17) on its duty to indemnify the Emerson Defendants in the ABN-AMRO lawsuit.   <u>Farmers Tex. County Mut. Ins. Co. v. Griffin</u>, 955 S.W.2d 81, 84 (Tex. 1997).   However, ABN-AMRO's allegations of intentional and knowing fraud, illegal pre-closing practices, diminution in the value of the homes caused by actions other than property damage, the cost of repairs to the homes themselves, and claims for punitive and exemplary damages are all outside of the policies' coverage.   The allocation of defense costs is discussed <u>infra</u> Section VII.

## VI.   <u>The Home Buyers' Lawsuit</u>

### A.   The Complaint

The Home Buyers' Sixteenth Amended Petition largely echos ABN-AMRO's complaint with regard to faulty construction and attachment. The Home Buyers claim that the Emerson Defendants failed to use ordinary care in the hiring and supervision of persons and entities utilized for site preparation, landscaping, land contouring, laying

-24-

the foundations, assembly of the manufactured homes, attachment of electrical and water utilities, attachment to in-line sewage disposal or construction and attachment to septic sewage disposal systems, and selection of water utilities.[52]  The Home Buyers assert that this negligence has caused flooding, sewage backups, standing water under the dwelling and on the home site, foundation shifting and uneven settling, structural damage to the homes, water penetration, mold, rotting floor boards and wall panels, separation of the mated "halves" of the manufactured homes, bucking of siding and skirting, depositing of fecal matter onto home site, variable electrical current, electrical overloads, and, in some cases, fires.[53]

The Home Buyers also allege that the Emerson Defendants negligently created misleading advertisements, which understated the costs of ownership and overstated the habitability and amenities of the homes.[54]  The Home Buyers claim that they relied on these misstatements and were injured when their payments were

---

[52]Plaintiff Nautilus Insurance Company's Supplemental Motion for Summary Judgment and Supplemental Reply to the Raybon/Emerson Defendants' Supplemental Response to Plaintiff's Motion for Summary Judgment, Docket Entry No. 43, Exhibit 1, Raybon Entities Homebuyers Association Sixteenth Amended Original Petition, p. 19.

[53]Id.

[54]Id. at 17–18.

more expensive than advertised.[55]

In addition, the Home Buyers allege that the Emerson Defendants were negligent in the selection of an inexperienced in-house insurance agency to write the necessary coverage.[56] The Home Buyers claim that the insurers mistakenly wrote hazard insurance coverage in amounts that were excessive, which resulted in excessive premiums.[57] The Home Buyers also allege that the Emerson Defendants' advertisements and insurance practices are violations of the Texas Deceptive Trade Practices Act.[58]

Alternatively, the Home Buyers allege that the Emerson Defendants' actions constitute common law and statutory fraud and breach of contract.[59]

**B.   Analysis**

Nautilus again argues that the Home Buyers' allegations of faulty construction and attachment of the manufactured homes are

---

[55]Id.

[56]Id. at 14-15.

[57]Plaintiff Nautilus Insurance Company's Supplemental Motion for Summary Judgment and Supplemental Reply to the Raybon/Emerson Defendants' Supplemental Response to Plaintiff's Motion for Summary Judgment, Docket Entry No. 43, Exhibit 1, Raybon Entities Homebuyers Association Sixteenth Amended Original Petition, pp. 19-20.

[58]Id. at 20-21.

[59]Id. at 21-24.

excluded by the policies' work/product exclusions.[60]  Assuming that
the facts alleged by the Home Buyers are true, the Emerson
Defendants' negligence caused property damage to the homes and
surrounding land.  As with the ABN-AMRO complaint, the homes and
attachments constitute the Emerson Defendants' "products" and
"work."  Therefore, repairs to the homes themselves are excluded
from coverage under the policies' work/product exclusions.
However, any remaining diminution in value attributable to the
property damage after repairs are made is potentially covered by
the policies and, therefore, triggers Nautilus's duty to defend.
See Hartford Casualty Co. v. Cruse, 938 F.2d 601 (5th Cir. 1991)
(holding that homeowners who alleged that the insured caused
property damage could recover for the resulting diminution of the
house's market value after repairs).  Similarly, any damage to the
real property surrounding the homes is potentially covered by the
policies because the real property is not the Emerson Defendants'
"work" or "product."  The extent and type of damage to the real
property is unclear from the Home Buyers' petition.  However, to
the extent such damage is due to sewage dispersal, mold, mildew,
rot, or rust it would be excluded under the "pollution" and
"microorganisms, biological organisms, bioaerosols, or organic

_____

[60]Nautilus Insurance Company's Reply to ABN-AMRO and Emerson
Defendants' Supplement to Their Response to Motion for Summary
Judgment, Docket Entry No. 26, pp. 6-15.  Like the ABN-AMRO
complaint, the Home Buyers' petition does not allege that any of
the construction work was performed by subcontractors.

contaminants" exclusions.[61]

Certain other claims made by the Home Buyers are not covered by the policies. First, the allegations that the Emerson Defendants produced misleading advertising is an economic injury unrelated to any property damage. The policies' Coverage B only insures "personal and advertising injury," which means injury arising out of one or more of the following offenses:

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services;

e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

f. The use of another's advertising idea in your "advertisement"; or

g. Infringing upon another's copyright, trade dress or slogan in your "advertisement."[62]

---

[61]See supra footnotes 49 and 50 for a description of these exceptions. The Home Buyers do not argue with Nautilus's assertion that these exclusions apply and do not argue that the provisions are ambiguous.

[62]Nautilus Insurance Company's Motion for Summary Judgment and Brief in Support, Docket Entry No. 17, Exhibit 3, p. NIC 230; Exhibit 4, p. NIC 182; Exhibit 5, p. NIC 293; Exhibit 6,

(continued...)

-28-

The Home Buyers do not allege any facts that potentially fall within this definition.   Furthermore, the policies explicitly exclude from Coverage B any claims for:

> b.   Material   Published   with   Knowledge   of Falsity . . .[63]
>
> g.   Quality   or   Performance   of   Goods-Failure   to Conform to Statements:   "Personal and advertising injury"   arising   out   of   the   failure   of   goods, products or services to conform with any statement of   quality   or   performance   made   in   your "advertisement."[64]
>
> h.   Wrong   Description   of   Prices:   "Personal   or advertising   injury"   arising   out   of   the   wrong description   of   the   price   of   goods,   products   or services stated in your "advertisement."[65]

The Home Buyers' claims with regard to over-insurance are also economic   damages   unrelated   to   any   "property   damage"   and   are therefore not covered by the policies.   See Kessler, 932 S.W.2d at 733.

Lastly, the Home Buyers' alternative claims that the Emerson Defendants committed intentional fraud fall within the policies' exception for "intended or expected" damage.[66]

---

[62](...continued)
p. NIC 367; Exhibit 7, p. NIC 435.

[63]Id.

[64]Id.

[65]Id.

[66]See supra note 24 and accompanying text.

-29-

C.    **Conclusion**

The court concludes that the Home Buyers' petition alleges facts sufficient to support Nautilus's duty to defend since the diminution in the value of the homes, above the cost of repairs, attributable to physical defects and damage to the real property surrounding the homes are potentially covered by Nautilus's policies. Nautilus's Motion for Summary Judgment (Docket Entry No. 17) on its duty to defend the Emerson Defendants in the underlying Home Buyers lawsuit will therefore be denied. Because Nautilus owes the Emerson Defendants a defense, the court will also deny Nautilus's Motion for Summary Judgment (Docket Entry No. 17) on its duty to indemnify the Emerson Defendants in the Home Buyers' lawsuit. Farmers Tex. County Mut. Ins. Co. v. Griffin, 955 S.W.2d 81, 84 (Tex. 1997). However, the Home Buyers' allegations of intentional and knowing fraud, advertising misrepresentations, excessive hazzard insurance, diminution in the value of the homes caused by actions other than property damage, and the cost of repairs to the homes themselves, are all outside of the policies' coverage. The allocation of defense costs is discussed infra Section VII.

## VII. **Apportionment of Defense Costs**

Because the claims against the Emerson Defendants are not all covered by the Nautilus policies, it may be proper for the Emerson

Defendants to bear part of the defense costs.  In <u>Porter v.</u> <u>American Optical Corp.</u>, 641 F.2d 1128 (5th Cir.), <u>cert. denied</u>, 102 S. Ct. 686 (1981), the Fifth Circuit adopted the reasoning of <u>Insurance Co. of North America v. Forty-Eight Insulations, Inc.</u>, 633 F.2d 1212 (6th Cir. 1980), which held:

> An insurer contracts to pay the entire cost of defending a claim which has arisen within the policy period.  The insurer has not contracted to pay defense costs for occurrences which took place outside the policy period.  Where the distinction can be readily made, the insured must pay its fair share of the defense of the non-covered risk.

<u>Id.</u> at 1224-25.  In <u>EEOC v. Southern Pub. Co.</u>, 894 F.2d 785, 790 (5th Cir. 1990), the court affirmed the apportionment rule in <u>Forty-Eight Insulations</u> and held that it was improper for the insurer to bear all defense costs where the insurer had a duty to defend, but not all claims were covered by the policy.  <u>See also</u> <u>Gulf Chemical & Metallurgical Corp. v. Assoc. Metals & Minerals</u> <u>Corp.</u>, 1 F.3d 365 (5th Cir. 1993) (holding that defense costs should be apportioned in a case involving continuous toxic exposure).

## VIII.  <u>Conclusion and Order</u>

For the reasons stated above, the court concludes that summary judgment is not appropriate.  Nautilus Insurance Company's Motion for Summary Judgment (Docket Entry No. 17) is **DENIED**.  The court will conduct a status conference on December 15, 2006, at 3:00 p.m., in Court Room 9-B, 9th Floor, United States Courthouse,

515 Rusk Avenue, Houston, Texas.

      **SIGNED** at Houston, Texas, on this 8th day of December, 2006.

_____
          SIM LAKE
UNITED STATES DISTRICT JUDGE